JANE L., et al., Plaintiffs,

v.

Norman **BANGERTER,**
et al., Defendants.

Civ. No. 91–C–345G.

United States District Court,
D. Utah, C.D.

May 22, 1992.

Janet Benshoof, Eve Gartner, Rachel Pine, New York City, Jeffrey Oritt, Wilkins, Oritt & Headman, Salt Lake City, Utah, Howard Lundgren and Simon Heller, for plaintiffs.

Mary Anne Wood, Wood & Wood, Anthony Quinn, James Soper, Chief, Litigation Div., Asst. Atty. Gen., Paul Durham, Durham & Evans, Salt Lake City, Utah, and Kay Balmforth, for defendants.

MEMORANDUM DECISION AND ORDER IN RE DEFENDANTS' MOTION TO DISMISS AND CERTAIN ISSUES IN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

J. THOMAS GREENE, District Judge.

This matter came regularly before the court on March 13, 1992, on defendants' Motion for Summary Judgment and defendants' Motion to Dismiss. Janet Benshoof, Eve Gartner, Rachel Pine, Jeffrey Oritt, Howard Lundgren and Simon Heller appeared for plaintiffs, and Mary Anne Wood, Anthony Quinn, James Soper, Paul Durham and Kay Balmforth appeared for defendants. Extensive oral argument was heard, after which the court took the matter under advisement. On April 10, 1992, after further argument addressed to the motions and other related matters, this court entered orders vacating trial, granting the motion to dismiss, and granting the motion for summary judgment as to certain issues, reserving the right to expand the bench rulings and to issue follow up written opinions.

Now being fully advised, and in furtherance of previous rulings, the court enters its memorandum decision and order with regard to defendants' Motion to Dismiss and certain issues raised in defendants' Motion for Summary Judgment.[1]

*Motion to Dismiss Converted to Motion for Summary Judgment*

■ When ruling on a Rule 12(b)(6) motion, the court reviews the allegations in the complaint. *Jackson v. Integra,* 952 F.2d 1260, 1261 (10th Cir.1991). On that basis, it is doubtful whether the plaintiffs implicated in the motion to dismiss have standing, and it is doubtful whether the amended complaint states claims for which relief can be granted in a facial challenge case such as this.[2]

If the court considers matters outside the complaint such as affidavits, depositions, or other exhibits, the motion to dismiss should be converted to a motion for summary judgment. At the hearing on April 10, 1992, the court advised counsel at the beginning of day long argument of its determination to convert the motion to dismiss into a motion for summary judgment and requested argument addressed to the motion as such.

■ The usual requirement of notice to the parties of the changed nature of the proceeding, as in *Nichols v. United States,* 796 F.2d 361, 365 (10th Cir.1986), is not applicable when the nonmovant introduces evidence beyond the pleadings. Plaintiffs in this action submitted several exhibits attached to their Memorandum in Opposition to defendants' motion to dismiss, including portions of six depositions, two declarations, three news clippings, an affidavit, portions of testimony before the Abortion Task Force, six resolutions on abortion made by various religious groups, and a statement by plaintiff Julie S. In addition, plaintiffs in several instances referenced or quoted from depositions and other materials submitted by the parties in connection with the pending motion for summary judgment and the previously submitted materials in support of plaintiffs' Motion for Preliminary Injunction. Manifestly, plaintiffs intended in opposing the motion to dismiss to "speak" beyond the pleadings. Plaintiffs have triggered the summary judgment standard of review, and cannot be heard to complain of prejudice as a result.

---

1. Claims of interference with free exercise of religion and violation of the Establishment Clause are overlapping issues as to which plaintiffs also submitted materials in opposition to the motion for summary judgment. In addition, plaintiffs submitted materials on the constitutional issues of equal protection and involuntary servitude relative to the summary judgment motion. All of these constitutional issues may be decided as a matter of law.

2. As the Supreme Court recently noted,

> A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that [the regulations] might operate unconstitutionally under some conceivable circumstances is insufficient to render [them] wholly invalid.

*Rust v. Sullivan,* — U.S. —, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991) (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987)).

*Summary Judgment is Appropriate in this Case—No Need for Trial*

█ Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An important mission of the summary judgment procedure is "to assess the proof in order to see whether there is a genuine need for trial." Fed. R.Civ.P. 56(e) advisory committee's note. In this case, the court has assessed and evaluated the proof and determined that there is no need for trial. In this regard, the Supreme Court has made it clear that only factual disputes which relate to matters of consequence are pertinent in summary judgment proceedings:

> Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Similarly, the Tenth Circuit has said, "[O]nly *material* factual disputes preclude summary judgment; factual disputes about immaterial items are irrelevant." *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991) (emphasis in original) (citation omitted). The Supreme Court has also stressed that summary adjudication rather than trial is often the best avenue even in complex cases:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive' determination of every action. *Celotex Corp. v. Catrett,* 477

U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

The posture of this case is that fully briefed and extensively argued motions to dismiss and for summary judgment were submitted for decision and taken under advisement. As a prelude to those motions, the parties engaged in extensive discovery. Various affidavits, deposition testimony and voluminous other materials were submitted in direct support of and in opposition to the pending motions, so that both motions in substance are presented as summary judgment motions. In addition, the parties have prepared and lodged with the court summaries of all depositions which have been taken, as well as the depositions themselves, verified summaries of the testimony of persons whose depositions were not taken, verified statements of direct testimony of the persons who were deposed and all exhibits which the parties rely upon.

All of the aforesaid materials were referred to the Magistrate Judge for review as to whether these constitute adjudicative facts[3] related to an actual factual dispute between the parties. The magistrate classified virtually all of the materials as nonadjudicative background facts.

The court has examined the depositions, written summaries, exhibits and other documents which have been submitted, and has determined that such can be and are of assistance in determining the legal issues presented. These materials present extensive historical and medical facts about abortions, pregnancies, professional and expert opinions, statistics, social and economic data, information concerning religious, family and psychological impacts, research, child rearing, adoption, and many other helpful things. These all bear upon such

---

**3.** Adjudicative facts are *evidentiary or historical* facts which are subject to the Rules of Evidence appropriate for resolution of disputes between parties. The court may take judicial notice of certain adjudicative facts (Rule 201) or such may be admissible as "relevant evidence" before a fact finder (Rule 401). Judge Keeton has noted the distinction thusly: "Adjudicative facts are simply the kinds of facts we ordinarily ask the jury to decide in a jury trial. Who did what

to whom, when, where and how? Was the light red? Was the defendant negligent? Is the person in the courtroom as a defendant the same person who stuck a gun in the teller's face at the bank? These kinds of questions are adjudicative-fact questions. All other fact questions are non-adjudicative fact questions." *Legislative Facts and Similar Things: Deciding Disputed Premise Facts,* 23 Minn.L.Rev. 1, 14 (1988).

things as balancing the liberty interest of women in making the choice to have an abortion against the state's interest in protecting unborn children, and the validity or invalidity of statutory exceptions in which the state has determined that abortions should not be prevented.

The court determines that for the most part the materials presented do not relate to controversies of the sort to be decided at a trial. Rather, these are the type of materials from which inferences may be made by the court in arriving at legal conclusions on the issues presented. Some of the materials would not be admissible under the rules of evidence, such as those that are conclusory, based upon hearsay, or not relevant to the issues. Some are more helpful and pertinent than others. However, a sufficient record exists by reason of the many materials which have been submitted by the parties for the court to determine the legal issues in this case. Accordingly, the court determines that a trial at this time is not necessary and that the issues presented can and should be determined by summary judgment.[4]

The court now supplements some of the bench rulings and orders which were issued on April 10, 1992, and makes additional rulings as follows:

4. In proceedings scheduled as bench trials where summary judgment is interposed, a trial is often unnecessary. Thus, in *Transworld Airlines, Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676, 684 (9th Cir.1990) the Ninth Circuit declared:

> [W]here the ultimate fact in dispute is destined for decision by the court rather than by a jury, there is no reason why the court and the parties should go through the motions of a trial if the court will eventually end up deciding on the same record.

In *Nunez v. Superior Oil Company*, 572 F.2d 1119, 1124 (5th Cir.1978), the Fifth Circuit pointed out:

> Hearing and viewing the witnesses subject to cross-examination would not aid the determination if there are neither issues of credibility nor controversies with respect to the substance of the proposed testimony. The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.

Judge Schwarzer reached a similar conclusion:

> [W]here the dispute is solely over ultimate facts, a trial normally adds nothing in a case where the judge is the trier of fact.

## VAGUENESS

■ Plaintiffs allege in their First Cause of Action that certain provisions of the Utah anti-abortion statute are void for vagueness. Specifically, plaintiffs claim that there are no commonly accepted meanings for the terms: "necessary to save the mother's life," "grave damage to the woman's medical health," and "grave defects." Utah Code Ann. § 76–7–302(2)(a), (d), (e) (Supp.1991).[5]

In the analysis of a criminal law, the basic test for vagueness is whether "men of common intelligence must necessarily guess at its meaning and differ as to its application." *Baggett v. Bullitt*, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964). If the statute in question does not implicate First Amendment rights, to prevail in a facial challenge on grounds of vagueness, plaintiffs must demonstrate that the statute is "impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982).[6] The statute must be "utterly devoid of a standard of conduct so that it 'simply has no core.'" *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1228 (11th Cir.1982).

*Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 479–80 (1982). See also a recent Monograph on Rule 56 by Judge Schwarzer and others at the Federal Judicial Center entitled, *The Analysis and Decision of Summary Judgment Motions* (1991).

5. Plaintiffs' challenge on vagueness grounds of the fetal experimentation statute is discussed and determined in a subsequent part of this memorandum. Vagueness issues also are presented in the statutes on post-viability abortion requirements, serious medical emergency, and spousal notification. These statutes remain under advisement.

6. In *Hoffman*, the court noted an exception in which state statutes could be invalidated in a facial challenge, i.e., infringement upon the First Amendment rights of plaintiffs, or overbreadth in inhibiting the First Amendment rights of others. 455 U.S. at 494–495, 102 S.Ct. at 1191. This court considers that First Amendment guarantees are not infringed in this case and that the overbreadth test is satisfied.

It is undeniable that terms such as "grave" and "health" cannot be definitively defined to account for every woman and every fetus in all conceivable circumstances. The Utah Legislature recognized the impossibility of this task, and instead of attempting further definition, in enacting the Utah statute it permitted the "professional judgment" of the attending physician to constitute the measure of determining the meaning of these general terms in a particular case. Utah Code Ann. § 76–7–302(2)(a), (d), (e) (Supp.1991).

The Supreme Court has upheld other statutes with similar mens rea provisions. *See, e.g., United States v. Vuitch*, 402 U.S. 62, 69–72, 91 S.Ct. 1294, 1298–99, 28 L.Ed.2d 601 (1971) (statute permitting abortion when necessary in physician's judgment to preserve health of woman was not void for vagueness); *Doe v. Bolton*, 410 U.S. 179, 191–192, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973) (statute requiring determination of necessity of abortion based upon attending physician's best clinical judgment not void for vagueness). The rationale behind these cases is applicable to the Utah Act. As the Supreme Court said in *Bolton*, "Whether, ... 'an abortion is necessary' [for a patient's physical or mental health] is a professional judgment that the Georgia physician will be called upon to make routinely." 410 U.S. at 192, 93 S.Ct. at 747. Similarly, under the Utah Act, whether an abortion is necessary to "prevent grave damage to the woman's medical health" is a routine question for the professional judgment of the attending physician. In addition, to face criminal liability under the Act, a doctor would have to violate his or her professional judgment. This subjective standard eliminates the threat of prosecution for good faith errors, and therefore saves the statute from a vagueness challenge brought by physicians.

## ESTABLISHMENT CLAUSE

The Establishment Clause provides: "Congress shall make no law respecting an establishment of religion." This clause has been interpreted by the Supreme Court to mean that "government may not promote or affiliate itself with any religious doctrine or organization" and "may not discriminate among persons on the basis of their religious beliefs." *County of Allegheny v. ACLU*, 492 U.S. 573, 590, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472 (1989).

Plaintiffs have challenged the Utah Abortion Act on Establishment Clause grounds in two ways. First, plaintiffs allege that the preamble is unconstitutional because it embodies a "religious viewpoint" concerning rights of unborn children. Second, plaintiffs allege that the Act mirrors and therefore endorses the position of the Church of Jesus Christ of Latter Day Saints ("LDS Church").

1. Recognition of Rights in Unborn Children in Utah's Preamble Does Not Constitute Establishment of Religion

■ The Utah Legislature made findings in the preamble to the Act that "unborn children have inherent and inalienable rights that are entitled to protection by the State of Utah pursuant to the provisions of the Utah Constitution." Utah Code Ann. § 76–7–301.1(1) (Supp.1991). One of these "inherent and inalienable rights" is the right to life. *Id.* § 76–7–301.1(3). The Legislature also found that "[t]he State of Utah has a compelling interest in the protection of the lives of unborn children." *Id.* § 76–7–301.1(2). In addition, it is recognized in the preamble that "a woman's liberty interest, in limited circumstances, may outweigh the unborn child's right to protection," i.e., when the abortion is "necessary to save the pregnant woman's life or prevent grave damage to her medical health, ... when pregnancy occurs as a result of rape or incest ... [or] if the unborn child would be born with grave defects." *Id.* § 76–7–301.1(4).

The Supreme Court reviewed a similar preamble in *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 504–507, 109 S.Ct. 3040, 3049–3050, 106 L.Ed.2d 410 (1989). The Missouri Act's preamble set forth "findings" by the Missouri legislature that "[t]he life of each human being begins at conception," and that "[u]nborn

children have protectable interests in life, health, and well-being." Mo.Rev.Stat. §§ 1.205.1(1), (2) (1986). The Act further states that unborn children have "all the rights, privileges, and immunities available to other persons, citizens, and residents of this state...." § 1.205.2.

The Supreme Court upheld the constitutionality of the Missouri Act preamble, and stated:

> Certainly the preamble does not by its terms regulate abortion or any other aspect of appellees' medical practice. The Court has emphasized that *Roe v. Wade* "implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion." *Maher v. Roe*, 432 U.S. [464] at 474, 53 L.Ed.2d 484, 97 S.Ct. 2376 [2382]. The preamble can be read simply to express that sort of value judgment.

*Webster*, 492 U.S. at 506, 109 S.Ct. at 3050.

Unlike the Missouri preamble, the Utah preamble does not explicitly state that life begins at conception, and in that regard does not go as far as the Missouri preamble.

This court holds as a matter of law that the Utah preamble does not violate the Establishment Clause.

**2. Regardless of Similarities with LDS Church Positions on Abortion, Utah's Statute Does Not Constitute Establishment of Religion**

■ Plaintiffs' second basis for a claim of violation of the Establishment Clause is that the Utah legislature promoted or affiliated itself with the LDS Church and its positions on abortion. In support, plaintiffs have submitted an affidavit from a Utah legislator stating that he believes the Act was religiously motivated; an article which appeared in the Salt Lake Tribune two weeks before the Utah legislature adopted the Abortion Act amendments, setting out the official LDS policy on abortion

(which is virtually identical to the Utah statute); an article in which defendant Norman Bangerter, Utah's Governor, is quoted acknowledging that his beliefs as a member of the LDS Church influenced his views on abortion; various declarations and depositions from religious leaders; portions of minutes of hearings held before the Abortion Task force; and portions of legislative debate.

Under *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), a statute is struck down on Establishment Clause grounds if it fails any one of the following three prongs: (1) the statute must have a clearly secular purpose; (2) the principal or primary effect of the statute must not be to advance or inhibit religion; and (3) the statute must not result in excessive entanglement with religion. *Id.* at 612–613, 91 S.Ct. at 2111.

■ *a. Secular Purpose*—Beginning with the first prong of the *Lemon* test, to be constitutional the Utah Act must have a clearly secular purpose. The Supreme Court has interpreted the "purpose prong" as posing the question "whether government's actual purpose is to endorse or disapprove of religion." *Edwards v. Aguillard*, 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring [7])). A "forbidden preference" for a particular sect can constitute "endorsement." *Allegheny County v. Greater Pittsburgh ACLU*, 492 U.S. 573, 605–606, 109 S.Ct. 3086, 3107, 106 L.Ed.2d 472 (1989). In this regard, the Supreme Court pointed out in *Aguillard:*

> A governmental intention to promote religion
>
> is clear when the State enacts a law to serve a religious purpose. This intention may be evidenced by promotion of religion in general ... or by advancement of a particular religious belief.... While

---

**7.** Justice O'Connor said in her concurring opinion that the inquiry under the "endorsement test" is whether the statute in question "sends a message to nonadherents that they are outsiders, not full members of the political community," and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch v. Donnelly*, 465 U.S. 668, 687–694, 104 S.Ct. 1355, 1366–1370, 79 L.Ed.2d 604 (1984).

the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of purpose be sincere and not a sham.

*Id.* at 585–586, 109 S.Ct. at 2578–2579.

The Utah legislature identified the Act's secular purpose as recognizing the "inherent and inalienable rights" of the "unborn." Utah Code Ann. § 76–7–301.1(1) (Supp.1991) In determining whether this was the "real" purpose of the Act, it is necessary to examine the statute on its face, and the relevant legislative history. *Aguillard,* 482 U.S. at 594, 107 S.Ct. at 2583.

In support of their claim that the Utah Legislature essentially collaborated with the LDS Church on the Abortion Act, plaintiffs first cite a newspaper article that appeared in the Salt Lake Tribune approximately two weeks before the Act passed. (*See* Pls.' Mem. Opp'n Mot. to Dis. Ex. I.) This article was a clarification of the LDS Church position on abortion and the abortion legislation in which an authorized spokesperson reaffirmed the opposition of the LDS Church to elective abortion, and said that there may be rare cases in which abortion may be justified: cases involving rape, incest, serious jeopardy to the woman's health, and severe birth defects that would not allow the baby to survive beyond birth. The article goes on to state that the LDS Church as an institution has not favored or opposed specific legislative proposals on abortion, but urges its "members as citizens to let their voices be heard in appropriate and legal ways that will evidence their belief in the sacredness of life." *Id.*

Plaintiffs next cite a newspaper article in which Governor Norman Bangerter said he did not confer with leaders of the LDS Church on the abortion bill, that he has not sought advice from the church, nor have they volunteered advice. *See* Exhibit J to Plaintiffs' Motion in Opposition to Motion to Dismiss. However, Governor Bangerter conceded that his LDS beliefs affected his views on abortion. "Obviously, I cannot separate myself from what I am and my upbringing." *Id.* Plaintiffs also took issue

with Representative Bradshaw's statement that "[t]his is by far the most difficult vote I have ever cast.... I've talked to my church leaders, my neighbors, my women friends, my gentlemen friends." *Id.*

Finally, plaintiffs point to the legislative history of the Act such as some of the testimony before the Abortion Task Force Committee, and some of the remarks made during debate on the Act, as illustrative of their conclusion that the LDS Church viewpoint was omnipresent. In particular, plaintiffs highlight comments of Professor Wilkins, the chief architect of the Utah Act, before the Abortion Task Force on June 13, 1990, in which he argued against a definition of the "grave danger to maternal health" exception that would exclude mental health. Plaintiffs particularly object to Wilkins' observation that:

> I know of a case personally where a woman belonging to the predominant religion in this state [the LDS Church] received authorization from the highest reaches of the church to have an abortion for mental health reasons. They were fairly extreme but nevertheless received authorization without ecclesiastical consequences. Does the state of Utah want to pass a law that goes further than what the predominant religion in the state would restrict? I think it would be unwise.

(*See* Pls.' Mem. Opp'n Mot. Partial Summ. J. 42.) Certain other people present at the public hearings, certain Task Force Members, and certain legislators made reference to their religious beliefs in connection with the abortion issue. While the matters referenced above are not meant to be exhaustive, they represent the general tenor of plaintiffs' position.

The Supreme Court was confronted with much stronger allegations of improper religious influence on the legislative process in *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). The statute under scrutiny in *McRae* was Title XIX of the Social Security Act, commonly known as the "Hyde Amendment." The version of the Hyde Amendment applicable in 1980 provided:

[N]one of the funds provided by this joint resolution shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported to a law enforcement agency or public health service.

Pub.L. No. 96–123, § 109, 93 Stat. 926. The Hyde Amendment is nearly identical to the Utah Act. The material difference between the two is that the Utah Act also permits an abortion in the case of a gravely deformed fetus. Utah Code Ann. § 76–7–302(2)(e) (Supp.1991).

The trial judge in *McRae* wrote a 12 page summary of Roman Catholic efforts to obtain support for passage of the Hyde Amendment and a Right to Life Amendment to the Constitution. *McRae v. Califano*, 491 F.Supp. 630, 702–715 (E.D.N.Y. 1980). These efforts included establishing State Coordinating Committees, Diocesan Pro–Life Committees, Parish Pro-life committees, and Pro-life action groups for each congressional district. The congressional district pro-life committees attempted to target elected officials and potential candidates to persuade them that abortion must be restricted, to elect members of their own group to posts in all local party organizations, and to keep a file on the pro-life position of every elected official and potential candidate. In addition, the Roman Catholic Church organized marches, distributed numerous anti-abortion publications, held raffles, conducted fund drives, directed an "avalanche" of ten million letters to Congress, etc. *Id.* The district judge recognized that the religious influence was pervasive. "Religious motivation and allegiance to religiously perceived principle on the part of many legislators, on both sides of the issue, are easy and necessary inferences from the record and the legislative history." *Id.* at 724. However, he concluded that there was no violation of the Establishment Clause. The court's reasoning is applicable to the Utah Act:

That the enactments reflect, if imperfectly, one religious view, if it were true, would not be decisive. The enactments deal with human conduct, and that conduct in an area related to human life. They reflect a traditionalist view more accurately than any religious one, a view that was reflected in most state statutes of a generation ago.

*Id.* at 741.

The Supreme Court affirmed the district court's holding that there was no violation of the Establishment Clause, and stated,

"[I]t does not follow that a statute violates the Establishment Clause because it 'happens to coincide or harmonize with the tenets of some or all religions'.... That the Judaeo–Christian religions oppose stealing does not mean that a State or the Federal Government may not, consistent with the Establishment Clause, enact laws prohibiting larceny."

*McRae*, 448 U.S. at 319, 100 S.Ct. at 2689.

Based upon the foregoing, this court concludes that the Utah Act has a secular purpose, even though it coincides with religious tenets, and holds that the Utah Act satisfies the first prong of *Lemon*.

b. *Primary Effect*—The second prong of the *Lemon* test requires that the statute's principal or primary effect must be one that neither advances nor inhibits religion. This second "effects" prong asks whether "irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch*, 465 U.S. at 690, 104 S.Ct. at 1368 (Justice O'Connor concurring). To answer that question, it is necessary to decide how an "objective observer" would view the state's action. *Board of Educ. of Westside Com. Schools v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 2371, 110 L.Ed.2d 191 (1990). *Foremaster v. City of St. George*, 882 F.2d 1485 (10th Cir.1989), *cert. denied*, 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).

In *Foremaster*, the Tenth Circuit reviewed an Establishment Clause challenge to a Utah city's use of an official logo depicting the local Mormon Temple. Even though the parties had agreed on stipulated facts that "endorsement" constitutes a legal question, the Tenth Circuit remand-

ed the case to the district court, ruling that evidence should be taken to determine how average observers would perceive the *primary effect* of the logo under the second prong—"effects" test. Plaintiffs urge that this case is similar and that it requires fact finding as to whether the Utah abortion statute is perceived by non adherents of the LDS faith as an endorsement of religion. The court rejects this analysis and rules that the determination here is a question of law. The case at bar involves essentially a legal determination to be arrived at by judicial interpretation of social or non-adjudicative facts, as was done by the Supreme Court relative to the first "secular purpose" prong in *Aguillard*. As explained by Justice O'Connor in *Lynch*, speaking of the "effects" prong:

> [W]hether a government activity communicates endorsement of religion is not a question of simple historical fact. Although evidentiary submissions may help answer it, the question is, like the question whether racial or sex-based classifications communicate an invidious message, in large part a legal question to be answered on the basis of judicial interpretation of social facts.

*Lynch*, 465 U.S. at 693–694, 104 S.Ct. at 1370 (O'Connor concurring). Requiring women in certain circumstances to bear the children they have conceived is as fully consistent with a traditional moral framework as it is with the viewpoint of any one or several religions. This court therefore rejects the notion that the Act "advances or inhibits" a particular religion as its primary effect.

 c. *Excessive Entanglements*—Finally, the last prong of the *Lemon* test asks whether the legislative enactment fosters excessive entanglement with religion. This prong is not directly relevant in this case because it primarily refers to a type of continuing relationship not present here between government and religion, such as annually renewed grants of assistance.[8] *McRae v. Califano*, 491 F.Supp. at 741. *See also Lynch v. Donnelly*, 465 U.S. at 684, 104 S.Ct. at 1364. These concerns are not raised and do not exist in connection with administration of the Utah Act.

## FREE EXERCISE CLAUSE

■ The Constitution provides in Amendment I that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."

■ The right of free exercise of religion means "first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Division v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990). In addition to beliefs, the Supreme Court in *Smith* recognized that certain physical acts may be integrally tied up with the exercise of religion (such as assembling for worship, proselytizing, or abstaining from certain foods or transportation). The court said:

> [W]e think ... that a state would be "prohibiting the free exercise [of religion]" if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display.

*Id.*[9] However, the Supreme Court did draw the line at permitting parties to use the Free Exercise Clause to avoid the reach of a criminal law to "relieve an individual

**8.** The "entanglement" prong applies to "programs, whose very nature is apt to entangle the state in details of administration...." *Lemon v. Kurtzman*, 403 U.S. 602, 615, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971) (citation omitted). The Court in *Lemon* concluded, after reviewing statutes that conditioned state aid to parochial schools upon rigid separation of religious doctrine and secular instruction, that "[a] comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected." *Id.* at 619, 91 S.Ct. at 2114.

**9.** In *Smith*, respondents were discharged from their employment as counselors at a private drug rehabilitation center because they had taken peyote at a ceremony of their Native American Church. When they applied for unemployment compensation their claims were denied due to an Oregon law that prohibits unemployment compensation for employees fired for work-related misconduct. Respondents' contention that the denial of unemployment compensation violated their First Amendment free exercise rights was rejected by the Supreme Court.

of the obligation to comply with a *'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'* " *Id.* at 879, 110 S.Ct. at 1600 (emphasis added) (citations omitted).

 The only instance in which the Supreme Court will permit a Free Exercise Clause claim to bar application of a neutral, generally applicable law[10] to religiously motivated action is if the plaintiff is able to allege a concomitant violation of another constitutional protection "such as freedom of speech and of the press." *Id.* at 881, 110 S.Ct. at 1601. Plaintiffs allege that the Act interferes with their Free Exercise rights, along with their right to freedom of speech, and their right to practice a profession. However, analysis of these claims reveals that they are not valid and that the "hybrid rights" exception present in *State of Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), does not apply here.[11] Here, the freedom of speech argument fails because there is no free speech right to solicit criminal acts as discussed below.[12] Similarly, plaintiffs' argument based upon the right to practice a profession fails. The right to practice the professions in question is created by the State, and is subject to the State's criminal laws.

Since the Utah law is not aimed at violation of the free exercise of religion, and no additional constitutional rights are violated so as to meet the "hybrid rights" exception, this court holds that the Free Exercise claim must be dismissed.

## FREEDOM OF SPEECH

 Plaintiffs' Seventh Cause of Action alleges that the Act violates the right to freedom of speech guaranteed by the First Amendment by prohibiting physicians and others from "exercising their freedom of conscience and expression." Plaintiffs' Fifth Cause of Action also claims free speech violations in that clergy allegedly would have certain limitations placed upon their religion-based abortion counseling.

 The Utah Act limits liability for an illegal abortion to "[a]ny person who *intentionally performs* an abortion other than authorized by this part...." Utah Code Ann. § 76–7–314 (Supp.1991) (emphasis added). It follows that a woman who seeks or obtains an abortion does not risk crimi-

10. Plaintiffs also cite *Smith* for the proposition that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith,* 494 U.S. at 884, 110 S.Ct. at 1603. Therefore, plaintiffs argue that because the Utah statute makes exceptions to the ban on abortion for victims of rape or incest, for cases of grave damage to the woman's health, or for cases of grave fetal defects, the State must have a compelling reason to exclude religion as a basis for exemption. This argument is not persuasive. The Supreme Court has expressly stated that the holding regarding statutes with individual exemptions applies only in the unemployment compensation context. As the Court observed, "Even if we were inclined to breathe into *Smith* [*v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965] some life beyond the unemployment compensation field, we would not apply it to require exemptions from a generally applicable criminal law." *Id.* Even assuming, *arguendo,* that the Utah Act is not "generally applicable," this Court still believes that it would be inappropriate to extend the holding of the unemployment compensation cases referred to in *Smith* in the face of Supreme Court reluctance to do so.

11. In *Yoder,* the Supreme Court granted an exemption to compulsory school-attendance laws as applied to Amish parents who were religiously opposed to sending their children to public schools after completion of the eighth grade. The Court justified this exemption by the presence of two constitutional rights: "the interests of parenthood ... combined with a free exercise claim...." *Yoder,* 406 U.S. at 233, 92 S.Ct. at 1542. Plaintiffs attempt to come within the "hybrid rights" exception in *Yoder* by asserting several alleged violations of the 13th and 14th Amendments, along with the right to intimate association between a husband and wife. However, these claims go beyond the formulation of the "hybrid rights" exception established by the Supreme Court in *Smith.* The Court concluded in *Smith* that, "[t]he present case does not present such a hybrid situation, but a free exercise right *unconnected* with any *communicative activity* or *parental right.*" *Smith,* 494 U.S. at 882, 110 S.Ct. at 1602 (emphasis added).

12. In this case, the coupled alleged "right" of free speech would constitute violation of a presumptively valid criminal law. (That is, Utah Code Ann. § 76–7–302 (Supp.1991) criminalizing certain unauthorized abortions.)

nal prosecution.[13] Further, because accessorial liability is only predicated upon aiding, encouraging or soliciting one who engages in conduct *which constitutes an offense,* counselors, clergy or doctors who counsel a woman on abortion options are also not violating the law.[14] Manifestly, if these counselors go so far as to solicit a doctor to perform an abortion against the doctor's professional judgment, there may be liability under the Utah accessorial liability statute. In this regard, the Supreme Court said in *Osborne v. Ohio,* 495 U.S. 103, 110, 110 S.Ct. 1691, 1696, 109 L.Ed.2d 98 (1990) (quoting *New York v. Ferber,* 458 U.S. 747, 761–762, 102 S.Ct. 3348, 3357, 73 L.Ed.2d 1113 (1982)):

> " 'It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.' "

When the speech in question is intended to incite another to crime, the constitutional right to free speech simply is not applicable.

### INVOLUNTARY SERVITUDE

■ In their Sixth Cause of Action, plaintiffs allege that the Utah Act violates the Thirteenth Amendment of the United States Constitution. The Thirteenth Amendment declares that "[n]either slavery nor involuntary servitude, except as punishment for a crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

The Supreme Court recently observed that "[w]hile the general spirit of the phrase "involuntary servitude" is easily comprehended, the exact range of conditions it prohibits is harder to define." *United States v. Kozminski,* 487 U.S. 931, 942, 108 S.Ct. 2751, 2759, 101 L.Ed.2d 788 (1988). Turning to prior decisions involving the Thirteenth Amendment, the Court concluded in *Kozminski* that "in every case in which this Court has found a condition of involuntary servitude, *the victim had no available choice but to work or be subject to legal sanction." Id.* at 943, 103 S.Ct. at 2760 (emphasis added).[15]

In an early case, the Supreme Court described the parameters of the Thirteenth Amendment thusly:

> *"[T]he amendment was not intended to introduce any novel doctrine with respect to certain descriptions of service which have always been treated as exceptional;* such as military and naval enlistments, or to disturb the right of parents and guardians to the custody of their minor children or wards."

*Robertson v. Baldwin,* 165 U.S. 275, 282, 17 S.Ct. 326, 329, 41 L.Ed. 715 (1897) (emphasis added). At the time of the ratification of the Thirteenth Amendment, December 18, 1865, 27 of the 36 states had enacted statutes prohibiting abortion, including 21 of the 27 ratifying states. U.S.C.A., Amendment XIII, Historical Notes; *Roe v. Wade,* 410 U.S. 113, 175 and 176 n. 1, 93 S.Ct. 705, 738 and 739 n. 1, 35 L.Ed.2d 147 (Rehnquist, J., dissenting) (1973). Given this historical context, the contention that one of the purposes of the

---

**13.** In fact, the Utah Act specifically excludes pregnant women from liability. "Notwithstanding any other provision of law, a woman who seeks to have or obtains an abortion for herself is not criminally liable." Utah Code Ann. § 76–7–314(1)(b) (Supp.1991).

**14.** Utah's accessorial liability statute provides: Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, request, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct. Utah Code Ann. § 76–2–202 (1990).

**15.** In *Kozminski* the Supreme Court further stated that "the primary purpose of the [Thirteenth] Amendment was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, but the Amendment was not limited to that purpose; the phrase "involuntary servitude" was intended to extend "to cover those forms of *compulsory labor* akin to African slavery which in practical operation would tend to produce like undesirable results." 487 U.S. at 942, 108 S.Ct. at 2759 (quoting *Butler v. Perry,* 240 U.S. 328, 332, 36 S.Ct. 258, 259, 60 L.Ed. 672 (1916)) (emphasis added).

Thirteenth Amendment was to secure the right of elective abortion totally lacks merit.

Plaintiffs argue that prohibiting elective abortions forces women into "slavery" or "involuntary servitude" by carrying a child to term. It strains credulity to equate the carrying of a child to term with "compulsory labor," and the argument borders on the frivolous.[16] Accordingly, this court finds that the Utah Act's requirements, as a matter of law, do not violate the Thirteenth Amendment.

## EQUAL PROTECTION

■ Plaintiffs' Fourth Cause of Action alleges that because only women's reproductive choices and rights to bodily integrity are being denied, the Utah Act discriminates on the basis of gender in violation of the Fourteenth Amendment to the United States Constitution, and Article I, Section 24 of the Utah Constitution.[17] The Supreme Court rejected a similar argument in *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). In *Geduldig,* the Supreme Court held that a state disability insurance system that excluded pregnancy from coverage did not discriminate on the basis of sex. The Court reasoned,

> While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is sex based classification.... Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.

**16.** In all events, however, the Utah statute does not create a situation where the woman has no available choice but to bear the child or be subject to legal sanction. No criminal penalties at all apply to a woman who chooses to abort by going to another state that permits abortion.

**17.** The Utah Constitutional issues are discussed in a separate memorandum on plaintiffs' Motion to Voluntarily Dismiss Claims Arising Under the Utah Constitution.

*Id.* at 496, n. 20, 94 S.Ct. at 2492 n. 20. Further, as the Supreme Court later noted, "this Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Sonoma County Superior Court,* 450 U.S. 464, 469, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981) (citations omitted). Abortion statutes are examples of cases in which the sexes are not biologically similarly situated. For this reason, the Equal Protection Clause does not require that the Utah Act "apply equally to all persons...." *Id.*

■ In the absence of improper gender based distinctions, the statute will be upheld against an Equal Protection challenge if it is rationally related to a legitimate state objective. The statute's purpose is to "protect and guarantee to unborn children their inherent and inalienable right to life." Utah Code Ann. § 76-7-301.1(3). The Supreme Court has recognized that the State has an "important and legitimate interest in protecting the potentiality of human life." *Roe v. Wade,* 410 U.S. 113, 162, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1973). Because the Act furthers the state interest in a direct and rational manner, the Act survives an Equal Protection challenge.

## FETAL EXPERIMENTATION: UTAH CODE ANN. SECTION 76-7-310

In addition to the claims asserted with respect to Utah's recently enacted abortion statutes, plaintiffs have alleged that the pre-existing provision of the Utah Code which prohibits the use of living unborn children for experimentation is facially unconstitutional.[18]

**18.** Additional provisions of the Utah Code claimed by plaintiffs to be facially unconstitutional remain under advisement pending the decision of the United States Supreme Court in *Planned Parenthood v. Casey,* 947 F.2d 682 (3rd Cir.1990), *cert. granted,* — U.S. —, 112 S.Ct. 931, 117 L.Ed.2d 104 (1992). These include: Utah Code Ann. §§ 76-7-307, 308 prescribing the standard of care to be used when aborting a potentially viable fetus; Utah Code Ann. § 76-7-315, waiving certain statutory requirements in

**1550**

Section 76–7–310 of the Utah Code provides as follows:

> Live unborn children may not be used for experimentation, but when advisable, in the best medical judgment of the physician, may be tested for genetic defects.

Utah Code Ann. § 76–7–310 (1990). Violation of section 76–7–310 is a third degree felony. *See* Utah Code Ann. § 76–7–314 (1990). Plaintiffs allege that the statute is unconstitutionally vague and that it impinges constitutionally protected privacy interests.

### 1. Vagueness

■ As has been noted previously,[19] to prevail on a vagueness challenge, plaintiffs must demonstrate that the statute is "impermissibly vague in all its applications," *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982), and that "men of common intelligence must necessarily guess at its meaning and differ as to its application." *Baggett v. Bullitt,* 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964).

Plaintiffs allege that the term "experimentation" in Utah Code § 76–7–310 is impermissibly vague because physicians and law enforcement authorities must necessarily guess whether a particular medical procedure should be considered "experimentation" in violation of the statute. Plaintiffs' argue that the line between the experimental and the generally recognized is difficult to draw and inherently vague and that the term "experimentation" might include innovative therapies intended to *benefit* a pregnant woman or her unborn child.

While this court agrees that the distinction between the experimental and the generally recognized is difficult to define,[20] this line of reasoning misses the mark with respect to analyzing the language of the Utah statute. Section 76–7–310 reads: "Live unborn children may not be *used* for experimentation...." Utah Code Ann. § 76–7–310 (emphasis added). The plain meaning of the statutory prohibition, as denoted by the phrase *"used* for experimentation,"* is to protect unborn children from tests or medical techniques which are designed solely to increase a researcher's knowledge and are not intended to provide any therapeutic benefit to the mother or child.[21] Moreover, a physician is not required to determine whether or not a particular medical procedure is experimental. The statute, by its plain terms, requires only that a physician determine whether a procedure is performed merely to increase general knowledge, or performed to benefit the pregnant woman or the unborn child. As long as there is intent to benefit the fetus or the mother, the fetus is not being *"used* for experimentation."

Utah rules of statutory construction support this interpretation. Utah law requires that "[t]he terms of a related code provision should be construed in a harmonious fashion." *Grayson Roper Ltd. v. Finlinson,* 782 P.2d 467, 471–472 (Utah 1989). Further, "a statute is presumed not to be intended to produce absurd consequences and ... where possible it will be given a reasonable and sensible construction." *Curtis v. Harmon Electronics, Inc.,* 575 P.2d 1044, 1046 (Utah 1978). It would be

---

a serious medical emergency where time does not permit compliance; and Utah Code Ann. § 76–7–304(2), requiring the attending physician, if possible, to notify a married woman's husband before she has an abortion.

**19.** *See* discussion on vagueness, *supra.*

**20.** *See Margaret v. Edwards,* 794 F.2d 994, 998–99 (5th Cir.1986); *Lifchez v. Hartigan,* 735 F.Supp. 1361 (N.D.Ill.1990).

**21.** This interpretation of the statute makes the same distinction as the University of Utah Medical Center's guidelines governing research on

human subjects and is as readily understood. The Medical Center's guidelines define "research" as:

> a systematic investigation designed to develop or contribute to general knowledge. "Research" should be distinguished from "innovative therapy." Both may involve departures from customary professional practice, but the primary justification for research is acquisition of information, while that for innovative therapy is patient care.

*See* Guidelines for Preparation of Application for Review by the Institutional Review Board (Health Sciences) at 1 (attached to Def.'s Mem. Supp.Summ.J. as exhibit X).

absurd to conclude, in the context of a statutory scheme aimed at protecting the unborn, that the legislature intended to prohibit beneficial treatments.

### 2. Privacy

 Plaintiffs' privacy challenge is based on the same misinterpretation of the statutory language as the vagueness challenge. Plaintiffs' allege that section 76–7–310 violates the right to privacy "because it criminalizes medical testing and treatment that may be necessary to procreation." (Def.'s Reply to Pl.'s Opp'n to Mot. Summ. J. at 111.) As explained above, the statute, by its plain terms, does not proscribe experimental tests or therapies intended to benefit a pregnant woman or her unborn child.

This court holds that the statute is not unconstitutionally vague; it does not impinge upon constitutionally protected privacy interests; and it is facially valid as a matter of law.

Based upon the foregoing, defendants' Motion to Dismiss is granted and defendants' Motion for Summary Judgment is granted in part. Accordingly, the federal constitutional claims set forth in the First, Fourth, Fifth, Sixth and Seventh Causes of Action are dismissed, and all clergy plaintiffs, all counselor plaintiffs, and all medical plaintiffs whose only role is to provide counselor type information and who do not themselves perform abortions are dismissed. Also, defendants' Motion for Summary Judgment relative to the fetal experimentation statute set forth in the First, Second and Third Causes of Action is granted. Pursuant to local rule 206(b), attorneys for defendants are directed to prepare and lodge with the court a form of judgment in conformance with the rulings made in this decision.

IT IS SO ORDERED.